# STRAFFORD,

## DECEMBER TERM, A. D. 1855.

---

### Miles *v.* Miles *& als.*

32  147
f74  54

A tenant for life may take and use upon the premises wood necessary for fire, and timber necessary for the repair of fences and buildings which are on the premises at the commencement of the tenancy.

A tenant for life cannot sell wood and timber from the land to pay for building or fencing materials, or for labor in repairing the fences or buildings; nor can he exchange it for such purposes. He cannot sell it for any purpose.

A tenant for life cannot use fire-wood cut on the land in any house not upon the premises; nor can he exchange wood or timber for fire-wood.

Where a replication is put into an answer in chancery, and the parties proceed to a hearing, all the allegations of the answer which are responsive to the bill, will be taken as true, unless they are disproved by two witnesses, or by one witness with corroborating circumstances.

If an answer in chancery admits or denies the facts stated in the bill, and then sets up other facts in defence or avoidance, the facts so stated must be proved by independent testimony.

*It 'seems* that the answer of a defendant which is responsive to a bill, is admissible in evidence in favor of a co-defendant.

Proceedings in chancery against a defendant·will be abated by his death, unless a bill of revivor be brought by or against his representatives.

In Equity. The bill was filed on the 19th day of February, 1850, by Abraham Miles, of Madbury, against Tichenor Miles, Nancy Miles, Lydia Miles, Joseph Meserve and his wife, Betsey, and John Kingman.

The bill sets forth that Reuben Miles, the husband of the defendant, Lydia Miles, and the father of the complainant and of

the defendants, Tichenor Miles, Nancy Miles and Betsey Meserve, who had married Joseph Meserve, made his will and a codicil thereto, in the year 1841 ; that he died on the 23d day of June, 1845, and that his will was proved on the 1st day of July, 1845.

That Reuben, by his will, gave to his daughter, Betsey Meserve, one half in common and undivided of his homestead farm in Madbury, including all the land which he then occupied, with one half of all the buildings thereon, and one half, in common and undivided, of his wood lot in Barrington, called the Waldron hill lot ; to have and to hold the same to the said Betsey and her assigns, during her natural life, and from and after her decease to such child or children as she might have living, forever. But in case said Betsey should die without having children alive at the time of her decease, then the same to go to Abraham Miles, the complainant, and to Tichenor Miles, one of the defendants, in equal shares, forever.

The bill then sets forth that Reuben gave the other half of his homestead and other real estate to his daughter, Nancy Miles, during her life ; remainder over to her children, and, in default of children, to Abraham and Tichenor, in the same manner as the other half was devised to Betsey.

That these devises to Betsey Meserve and Nancy Miles were subject to and made chargeable with any devise that might be made to his wife, Lydia : That he then devised to his wife one undivided third of said homestead and the other lands named in common, during her natural life :

That Joseph Meserve and his wife Betsey, on the 14th day of July, 1846, conveyed all their interest in the premises to the complainant, but the same interest was reconveyed to them on the 17th day of April, 1847 : That Nancy Miles and Lydia Miles, the widow, petitioned the probate court for partition of the lands so devised to them ; that partition was duly made, and the report of the committee dividing the same was accepted on the 4th day of April, 1848. The bill sets forth and describes the several tracts assigned to each : That among other lands

assigned to Lydia Miles, the widow, was a piece called the " Horse pasture ;" also, a piece called the " Calf pasture ;" also part of the orchard ; also, a lot at the southerly end of Hicks' hill ; also, a lot at the northerly end of Hicks' hill, and a part of the wood lot in Barrington : That there was assigned to Nancy Miles, among other pieces which are described, a lot called the " Ox pasture ;" also, a part of the lot called the " Cow pasture ;" also, a part of the orchard, and a part of the lot on the northerly end of Hicks' hill ; also, a part of the " wood lot" in Barrington, and that the residue of the premises were assigned to the Meserves as their share of the same.

That the defendant, John Kingman, claims to hold that part of the premises assigned to Meserve and his wife, and pretends to have a lease of the same : That Lydia Miles is about eighty years of age, and is still the widow of Reuben : That Betsey Meserve is fifty-six years of age, and has never had any children : That Nancy Miles is forty-seven years of age, and has never had any children, or been married.

The bill then charges that the complainant has reason to believe, and does believe, that all of the defendants, naming them, intend to commit strip and waste on said premises, and that there is an understanding, if not an express agreement, among them for that purpose : That when the premises were divided there was standing thereon a large amount of pine and oak wood and timber, and that there is still standing on some parts of the same a large amount of similar wood and timber : That the defendant, John Kingman, has, as the complainant has been informed, and believes to be true, for about two years last past, cut and drawn away wood and timber to a large amount from that part of the premises set off to Joseph and Betsey Meserve : That during that time Kingman has cut and drawn from the premises full twenty cords of fire wood, and sold the same ; that he has cut and hauled away pine logs sufficient to make from five to ten thousand feet of boards, and converted the same to his own use, but not on the premises ; and that said wood and timber were worth from one hundred to one hundred and fifty

dollars; and that Kingman told the complainant in the month of January, 1850, that he intended to cut wood on the premises that winter sufficient to last his fire two winters; and that Kingman never lived on any part of the premises.

That Nancy Miles has, every year since the death of her father, Reuben, cut and drawn oak wood and timber from the Waldron hill lot in Barrington, to a large amount, and sold the same to her own use; but how much the orator does not know, nor has he been able to ascertain, though he believes it to be worth two hundred dollars, or more: That Nancy, before the division, cut on any part of the premises that suited her convenience; and since the division has cut on that part assigned to her and to her mother, Lydia, with the knowledge of said Lydia, as the orator charges, and without any objection from her: That Nancy also cut, before the division, and drew away a large amount of oak ship timber from the Calf pasture, and a large amount of pine timber for mill logs from Hicks' hill, and sold the same for her own benefit; but for how much the complainant does not know, nor has he been able to ascertain, though he believes for one hundred dollars or more; and that in the month of January, 1850, she also caused two oak trees to be cut on Hicks' hill, fit for ship timber, and worth ten dollars: That Tichenor Miles, after the death of Reuben, and before the division of the premises, cut on Hicks' hill and on the Cow pasture sufficient pine timber to build him a large barn, and drew the same away from the premises and built a barn therewith, and that the timber was worth two hundred dollars; and that during the month of January, 1850, Tichenor cut and drew from that part of the premises set off to Lydia, on the north side of Hicks' hill, one large stick of oak ship timber, worth six dollars; and that he then said that he should cut and draw more timber from the same premises, and as much as he pleased.

The bill further charges the defendants, and others unknown, with confederating together to injure the complainant, and that they pretend that they have the right to cut the wood and timber on the premises, and sell the same when and so often as may suit their interest, to the full amount of all that is upon the land.

The bill then interrogates the defendants specifically as to all the matters which are set forth in general terms in the bill, and concludes by praying that the defendants may be restrained by injunction from committing any further strip and waste on the premises, or any part thereof, and from cutting and drawing wood and timber therefrom, beyond what tenants for life have a right to cut; and that the defendants may be compelled to account for all the wood and timber illegally cut by them, and to pay to the complainant his just proportion of the same ; and that the complainant may have such other and further relief in the premises as the nature and circumstances of the case may require.

*Lydia Miles*, the widow, admits in her answer the title to the premises to be in the complainant and others, as set forth in the bill, the same being derived from her husband, Reuben Miles, and that partition was made as stated : That she is upward of eighty years of age, and is still the widow of Reuben Miles : That Nancy Miles is forty-eight years old, has never been married, and has never had any child or children ; and that Betsey Meserve is fifty-seven years old, and has never had any child or children : That Tichenor Miles cut some timber for a barn frame, but, according to her best knowledge, information and belief, it was *before* the decease of her husband : That she now resides with her daughter Nancy, on the premises assigned to them, and has given up the management of all the business to her : That she has been unable, from decrepitude and disease, to manage or look after the farm, and knows little about it, or what has been done : That she has not herself cut, or hauled, or sold, or caused to be cut, or hauled, or sold, any wood or timber from any part of the premises at any time since the death of her husband, Reuben Miles ; and that she and her daughter Nancy have always been very economical in the use of fuel about the house ; have kept but one fire for them both, and have burnt chips and underwood most of the time, except in winter. She further says that the complainant and her son Tichenor have

both frequently said to her and to her daughter Nancy, that they had no objection to their, or either of them, cutting and selling so much wood as they might find necessary, to procure what they wanted about the house, and have also said that they thought Nancy had a hard time of it to carry on so much land without any one to assist her, and to take care of and support this defendant and herself; and that they both and each of them were desirous they should sell some wood and timber, to help her along; and that they would never object to any thing of the kind that she might do, unless she should commit unreasonable strip and waste.

She admits that there is a large amount of pine and oak wood and timber on the premises. She is ignorant of what the other defendants have done, and therefore cannot answer. She denies that there is or ever has been any understanding or agreement of any kind whatever among the defendants, or any of them, to commit strip or waste on the premises, or on any part thereof, or in any way to injure the same.

The answer of *Nancy Miles* admits the title and partition of the property, as stated in the bill.

So far as the other defendants are concerned, she states the facts in regard to them, upon her information and belief, to be as set forth by them respectively in their answers. As to the charges against herself particularly, she admits that for the three winters succeeding her father's death she cut and drew from the Waldron hill lot for the use of herself and her mother, at their house, about five cords a year. It was drawn to the house and cut up for the fire, except a few of the best sticks, which were cut into cord wood and piled up: That while she was thus cutting on the Waldron hill lot, the complainant was also cutting there, and cut, as she believes, full twenty cords; that he saw what she was doing, and made no objection, and that she has never cut any on that lot except as above stated.

She further admits that there were standing on Hicks' hill some pine trees which had been struck by lightning and killed,

and she caused them to be cut and drawn to the house for fire wood; but some of the best sticks were cut into cord wood, and piled up with that which had been drawn from Waldron Hill; that there was so cut into cord wood in all about five cords, which she and her mother needed for fuel; but, by prudence and economy in fuel, and keeping only one fire for her mother and herself, and especially by picking up chips and brush and underwood on the farm, and on lots of their neighbors, who had given her permission, where the wood and timber had been cut off, she was enabled to save these five cords and sell them for necessaries, which she and her mother absolutely needed; and this she supposed she had a right to do, as the complainant had himself cut, without objection from any of the defendants; and especially as the complainant had frequently told her that he was perfectly willing that she should cut and sell from any part of the premises, for the use of herself and mother, so much as she might find it convenient and necessary to sell, to the amount of twenty cords a year, or to the value of twenty-five dollars a year; and that the complainant has frequently so said, even up to the time of filing her answer: That she had the same permission from her brother Tichenor: That all she has cut and sold on the premises, both wood and timber, has not amounted to more than five dollars a year, and this she was specially licensed and permitted to do by both her brothers.

She further admits, that there was an old red oak, standing in the Calf pasture, hollow at the butt and dead at the top, which her brother Tichenor advised her to cut, as it endangered the cattle that were accustomed to lie under it, and injured the land and grass; that she cut it and sold it to Benjamin Mathes for about five dollars: That there was one other red oak standing in the field assigned to her, near the line of Tichenor's field, which injured both fields, and that Tichenor told her she must remove it, or he would: That she cut it and sold a part of it to Mathes for about three dollars and fifty cents, and burned the rest.

She further admits, that some time previous to the service of the injunction upon her, she cut two small oaks on Hicks' hill;

that the same remained on the spot where cut until the summer of 1851, when, by the express direction of the complainant, she sold them to said Mathes for about six dollars each.

She then states, that these four oaks and the five cords of wood, above described, is all that she has ever cut or caused to be cut on the premises, either for herself or her mother, except some hemlock and pine logs, which were manufactured into boards, planks and shingles, for the necessary repair of the buildings.

She further states, that at the time of her father's death there was piled up near his house about twenty cords of cord wood, prepared for market, which she took of the executors as a part of the legacy left her by her father, and she supposes the complainant has been misinformed in regard to this wood, and has supposed and been informed that she cut the same wrongfully on the premises.

She denies all intention to commit strip or waste, or in any way to injure the premises. She admits a large amount of pine and oak wood and timber on the premises.

The answer of *Tichenor Miles* admits the title and division of the property, as set forth in the bill; also admits, from information, the various matters personally known to and admitted by the other defendants; and admits a large quantity of pine and oak wood and timber on the premises. This defendant then states that in the winter of 1848 he found one John O. Langley cutting some pine trees on that part of the premises assigned to his sister Betsey Meserve, and forbid his cutting; and he at once quit work and never cut any more: That he cut about ten trees, which were small, swell-butted, knotty pines ; which would make boards fit only for fencing, and would not average over one hundred and twenty-five feet of boards each : That Langley said Kingman told him to cut them for fencing boards, and the tops into cord wood: That he does not know what became of them, but believes they were afterwards sawed into boards for bars.

He states his mother to be aged and infirm, and that she is taken care of by Nancy : That in the winter of 1849–'50 King-

man sold to Alfred Hoitt all the oak timber standing on a certain lot of his own, situated on Hicks' hill, adjoining the lot assigned to Lydia Miles, and among the rest a certain oak tree standing near the boundary between the lots : That this defendant claimed the tree as standing on the land of his late father, and cut it, carried it away and sold it : That he afterwards saw the complainant, and informed him of what he had done, and that he might have the pay for the tree. The line is a disputed one, and it is not yet settled on whose land the tree was. Kingman claims it as his : That the tree was not worth over three or four dollars standing.

He further states that during the two years previous to his father's death, he cut, by his permission, some pine timber for a barn frame on different parts of the premises, and at the time of his father's death the timber was piled up in this defendant's field, near his house ; that there was not enough for the frame, and he subsequently bought of various individuals about thirty-five hundred feet, to complete it : That he never, at any time after his father's death, cut or caused to be cut any timber upon the premises, unless it shall turn out that the oak on Hicks' hill was on a part of the same. He admits, however, that he told his sister Nancy to cut the oak standing near the line between them, as it was injuring the fields, and that she cut it. With these two exceptions he has never cut or caused to be cut, on any part of the premises, since his father's death, any wood or timber whatever : That he consented to and approved of all that his sister Nancy had done for herself and mother.

He states further, that he has frequently heard the complainant say that he had no objection whatever to Nancy's cutting and selling, for herself and mother, wood and timber to the value of $25 a year ; and that he, the complainant, had given her permission to cut to that amount, and would never deny her such a privilege : That the cutting by Nancy would not amount to five dollars a year.

He denies that he ever told the complainant that he should cut and haul from the Hicks' hill lot, or from any other part of

the premises, or that he should cut as much as he pleased, or any thing to that effect.

He states that the complainant has no reason to believe that any of the defendants intend to commit strip or waste on the premises, and he utterly denies any such intention by himself or others.

*John Kingman* answers, as to his information in regard to the facts respecting the other defendants, as stated by them. As to what relates to him personally, he says: That in the spring of 1848 he hired of Joseph Meserve, and his wife Betsey, the part of the premises assigned to Betsey, and took a lease of the same for the term of one year, and afterwards from year to year, reserving to either party the right to terminate the lease by giving to the other party at least thirty days' notice before the first day of April in any year; that by the lease he was to have all the privileges and appurtenances belonging to the premises as fully as Betsey, by the terms of her father's will, could enjoy the same : That he has never himself resided upon the premises, but during the years 1848 and 1849 he carried on the same, and received the profits accruing therefrom; and that, more than thirty days before the first day of April, 1850, he notified the lessors that he should terminate the lease; and since that time he has had nothing whatsoever to do with the premises : That during the two years he occupied a part of the premises, he kept no fire there, and neither cut, or caused, or permitted to be cut or hauled any fire-wood or timber from said premises, except as follows : In December, 1848, he caused ten small sapling pines, standing in the pasture, to be cut and sawed into boards, for the purpose of repairing the bars and fences on the premises leased to him; and again, in the winter of 1849–'50 he caused two other trees, of like description, standing in the pasture, to be cut and sawed into boards, for the same purpose. The twelve trees made less than two thousand feet of boards in . all. The trees are such as are used in that neighborhood for fencing, and were needed at that time for properly repairing the bars and fences; that a part of them have been so used, and the rest are

on the premises for the Meserves. The market value of these boards was from four to five dollars a thousand, and the full value of all that were used by him was not above seven or eight dollars: That he caused the tops of these trees to be cut up for fire-wood, making about five or six cords, worth fifty cents per cord, besides the cutting; that the wood has been kept for the Meserves, and that, with the exception of these twelve trees, this defendant has never cut or caused to be cut any wood or timber whatsoever on the premises.

He affirms that he never at any time told the complainant that he intended to cut any wood whatever on said premises, but only that he had a right to cut sufficient to keep one fire. He denies all manner of unlawful combinations.

*Joseph Meserve* and *Betsey Meserve,* in their answer, state, that they leased the premises to Kingman in 1848, as stated by him; that they have not themselves been upon the premises since 1847, having resided since that time in the States of New-York and Illinois: That they have never themselves cut any wood or timber on said premises, or permitted any to be cut, except such reasonable and necessary quantities of wood and timber as were required to be used on the premises for fire-wood and fencing: That they have never permitted any to be cut and hauled from the premises; and they deny all unlawful acts or intentions.

*Wheeler,* for the complainant.

The rule of courts of equity is, that where the defendant, *in express terms,* negatives the allegations in the bill, and the evidence of one person only affirms what has been so negatived, then the court will neither make a decree nor send it to a trial at law.

Where, however, the answer of the defendant is not responsive to the bill, but sets up affirmative allegations in opposition to, or in evidence of, the plaintiff's demand, and is replied to, the evidence is of no avail in respect to such allegations, and the defendant is as much bound to establish the allegations so made by independent testimony, as the plaintiff is to sustain his bill. 2 Daniel Ch. Pr. 983, 984, and note.

We refer to these familiar and well established rules, because so much of the answers of these defendants is not responsive to the bill, but set up affirmative allegations in opposition to, or in avoidance of, the allegations in the bill.

A tenant cannot sell or exchange trees for any purpose; he only has a right to cut and use them for specific purposes. *Elliot* v. *Smith*, 2 N. H. 431.

A tenant in dower may take fire-wood from the land, if there were a house thereon when her dower was assigned. But she can use the wood only in *such* house; and if she use or permit another to use it elsewhere, it will be waste. 7 N. H. 341.

John Kingman in his answer admits that he cut twelve pine trees on said premises, and John O. Langley testifies that he cut eleven pine trees on said premises by Kingman's direction.

Benjamin Mathes testifies that Kingman agreed with him to haul and saw said logs to the halves, which he did. Langley testifies that Kingman told him he was going to pay for sawing out of the lumber:

This was substantially a sale of one half of those logs, and consequently waste. Of the other half, only eight boards were ever hauled back.

Kingman admits and Langley testifies that he cut 5½ cords of pine wood on said lot, and Langley testifies that the wood was hauled off that winter.

Joseph Meserve and Betsey Meserve admit that they leased the premises to Kingman, and Langley testifies that Kingman told him, that they told him, Kingman, to take pay for sawing the lumber out of the lumber.

Nancy Miles in her answer admits that she has cut wood and timber on Waldron hill lot, and sold to the value of five dollars per year.

The testimony of Reuben Seavey, Brasbridge, and Andrew H. Young, shows that she has cut much more for sale, and contradicts her statement and Lydia's in relation to keeping but one fire, and shows that they constantly kept two.

Nancy Miles also admits that she has cut upon the Calf

pasture and Hicks' hill four oak trees, &c. Two of those she cut were afterwards *sold* by the consent of the complainant.

The waste in this was in *cutting*. They were thrifty trees, and were cut without consent. After they were cut the complainant could do no better than consent to the sale, and the testimony of Mathes shows this was the view he took of it when he consented.

The testimony of Jackson Mathes, Pendexter and Burnham, shows that there has been much more cut.

The testimony of Jackson (and this is confirmed by that of Pendexter,) shows that fifteen red oak trees have been cut on the Calf pasture lot since the death of Reuben.

This lot was set off to Lydia and Nancy ; they have had the possession and control of the same since Reuben's death, and are responsible for what has been cut.

The testimony of Burnham shows fifty-nine feet of white oak timber was sold by Lydia Miles to George Raynes, January 8, 1850, and that Tichenor, Lydia and Nancy have been continually selling wood since the death of Reuben to the time of filing this bill.

Tichenor Miles admits that he cut a barn frame on Hicks' hill and the Calf pasture, but charges that it was done *before* the death of Reuben.

Joseph Eastman says expressly, it was *after* Reuben's death. He tells the time he went to work for Tichenor, the time Reuben died, and the time he helped cut the frame, " the next winter."

Nancy consented that he might cut the frame, and Tichenor was to pay her.

There is much other evidence of waste committed by all of these defendants, not specially charged in the bill, but they strengthen the evidence upon those acts charged, and show the disposition and intention of the defendants, the equity of the prayer of the bill, and the importance to this complainant that the parties be enjoined from committing further waste.

*Christie* and *Kingman*, for the defendants.

The defendant, John Kingman, being dead, and his estate administered in the insolvent course, no further proceedings can be had here against him. · Comp. Stat., chap. 170, § 8.

There is no allegation in the bill charging any specific act or wrong upon either Lydia Miles, Betsey Meserve, or Joseph Meserve ; and their answers distinctly deny any acts or doings prejudicial to the rights of the complainant. These defendants must be discharged, with their costs.

The bill alleges that Tichenor Miles, after the death of his father, cut a barn-frame on the property devised, and a stick of oak timber worth six dollars. The answer denies that the barn-frame was cut *after the death* of Reuben Miles ; but alleges and asserts that it was cut in the life-time of the father, by his express consent and direction ; and was sawed out and piled up at Tichenor's house at the time his father died. And the only evidence offered by the complainant to contradict this answer, is the deposition of Joseph Eastman, who, admits that he cannot tell whether the barn-frame was cut before or after the decease of Reuben Miles. As to the oak tree alleged to have been cut by Tichenor, it is not proved to have belonged to the estate of Reuben Miles.

The answer asserts that it stood near the line of John Kingman's land ; that the line is not settled; and that Kingman sold the tree, while standing, to Hoitt, and always claimed it as his ; that this defendant does not know on whose land said tree was standing ; that it was not worth more than three or four dollars, and that one half of it belonged to Tichenor, if any of it belonged to the complainant.

There is no evidence in relation to this matter, except what is contained in Tichenor's answer ; and this defendant cannot be charged for the oak ; and must therefore be discharged with his costs. He is a joint reversioner with the complainant, and has a right to one half of all the property in common with him, subject to the life estates. He admits that he licensed his mother and sister to cut and sell wood and timber in small quantities, from the premises ; and this he had an undoubted right to do ; at least, so far as his half is concerned.

Miles *v.* Miles.

The bill charges that Nancy Miles cut and sold from the Waldron hill lot, oak wood and timber, but the orator does not know how much ; that she cut and sold oak and ship timber from the Calf pasture and pine mill logs on Hicks' hill. The answer alleges that the defendant, during the first three winters after her father's death, cut on the Waldron hill lot about five cords of wood each winter, for herself and her mother, as fire-wood : That she saved about five cords of this wood, by picking up brush and underwood to burn ; and by the consent, license and permission of the complainant, and of her brother Tichenor, she sold the five cords thus saved, for the benefit of herself and her mother ; and Tichenor affirms in his answer that he gave his consent for Nancy to sell for this purpose, and that he had frequently heard the complainant give his consent also.

There is no evidence to contradict any of this. The answer affirms, and the plaintiff's evidence proves, that all the pine and hemlock logs that this defendant has cut on any part of the premises, were cut for repairing the buildings and fences thereon, and most of it has already been used in that way.

The answer admits the cutting and selling of one red oak in the Calf pasture, and one in the field ; both of them bringing about five dollars. They were cut by the direction of Tichenor, to get them out of the way ; as one was old and fast decaying, and endangered the cattle that were accustomed to lie under it ; and the other shaded and injured the fields where it grew.

The two white oaks cut on Hicks' hill were sold by the express direction of the complainant, and were cut under the license given by him and his brother, as alleged in the answer, to get necessaries for this defendant and her mother. This defendant must also be discharged with her costs.

But on general principles this complainant fails to sustain his bill, as against any one of the defendants ; because it requires two witnesses to overcome the answer of the defendants in all matters that are material, by being responsive to the bill. And this is not done in a single instance. 2 Story's Eq., § 1528. Because, also, the acts admitted in the answers, as against this

complainant, are of such trifling consequences as to render the whole matter entirely ". below the dignity of the court." 1 Daniel's Ch. Prac., 379; Story's Eq. Pl., § 500–1, 2, and note.

EASTMAN, J. From an examination of the bill and answers it will be perceived that the defendant, Nancy Miles, and her sister, Betsey Meserve, have severally life estates in the premises, subject to the dower of their mother, Lydia Miles ; and that Abraham Miles, the complainant, and Tichenor Miles, the brother, and one of the defendants, are interested as tenants in common in the remainder.

The complainant, being thus interested in the premises as a remainder-man, has resorted to a remedy for the grievances complained of, the staying of waste. That is recognised, not only by courts of equity generally, but by the express provisions of our statute. *Williams* v. *Duke of Bolton*, 3 P. Williams 268, *n ;* 1 Story's Com. § 69, note ; ditto, § 517, 518 ; 4 Kent's Com. 77 ; 3 Danl's Ch. Prac. 1849 ; Rev. Stat., chap. 171, § 7.

But is the complainant entitled to the relief sought by his bill, when the answers and evidence are considered ?

The defendants deny all the general charges in the bill of cutting upon the premises, or of combination, agreement, or intent to commit waste, and there is no evidence to overthrow the answers in this respect ; so that, in deciding whether the bill is sustained, we are brought to the specific acts charged against each defendant, and to the law governing the same.

According to Sir *Edward Coke*, every tenant for life is entitled, of common right, to take reasonable *estovers*, that is, wood from off the land for fuel, fences, agricultural erections, and other necessary improvements. They are *estoveria œdificandi, ardendi, arandi et claudendi.* Co. Litt. 41, *b.* But under the pretence of *estovers*, the tenant must not destroy the timber, or do any other permanent injury to the inheritance. Co. Litt. 93, *a, b ;* ditto 53, *a.* And Chancellor Kent lays down the same general rule. 4 Kent's Com. 73, 75.

But to what precise extent tenants for life may go in exercis-

ing their rights under this general rule, the authorities are not in all respects agreed. Kent says that the American doctrine on the subject is more enlarged than the English, and better accommodated to the circumstances of a new and growing country. 4 Kent's Com. 76.

In *Elliot* v. *Smith*, 2 N. H. 432, *Woodbury*, Justice, says, that what ought to be deemed timber trees in this country, and whether they can ever be cut for agricultural purposes, are questions of some difficulty. In that case it was held that a tenant for life may cut trees for fire-wood, and for fencing the land. The tenant had cut and sold two trees, to pay for boards and stakes, and labor done in repairing the fences on the land, and the cutting was held illegal.

In *Fuller* v. *Wason*, 7 N. H. 341, it was decided that in order to entitle a tenant in dower to take fire-wood, there must be a house upon the land when it is assigned to her as dower.; that the tenant can use the wood only in such house ; and if she take it herself, or permit any one else to take it, to be used elsewhere, it is waste. *Richardson*, C. J., in delivering the opinion of the court, says that every tenant in dower has a right, incident to the estate, to take fire-wood, if there be a house assigned to her on the land ; to take timber for the repairing of fences and buildings upon the land, and to take timber to make plows, &c., if there be tillage ; but that she has only a special property in the wood, to use it for those purposes upon the land, and can not sell it : That she cannot take timber from the land to build a new house, or new fences, where there were none before. And the learned chief justice cites several authorities to sustain his views.

In *Paddleford* v. *Paddleford*, 7 Pick. 152, it was held that it was not waste to cut oak trees for fire-wood, or to make posts for fences, but that it was waste to cut timber trees and sell them in exchange for fire-wood.

There can be no doubt that a tenant for life may take from the land wood necessary for the repairing of fences and buildings which are on the premises at the commencement of the tenancy. Co. Litt. 41, *b*, and 53, *b ;* 2 Black. Com. 122 ; *Paddleford* v.

*Paddleford*, 7 Pick. 152 ; *Fuller* v. *Wason*, 7 N. H. 341 ; *Elliott* v. *Smith*, 2 N. H. 430.

But this right cannot extend beyond the proper use of wood and timber upon the premises themselves. The title in the wood and timber, until cut, is in the reversioner or remainder-man. The estate of the tenant for life consists in the use of the premises, and nothing more. This use, to be made of service to the tenant, must be such as to give him necessary fuel, that he may remain upon the premises, and sufficient timber to keep the fences and buildings in repair. The annual crops of course belong to him, for they are not permanent in their nature. It is equally, too, for the advantage of the reversioner that the buildings and fences should not be suffered to go to decay. But when it is permitted to the tenant to cut wood or timber for purposes disconnected with the premises, he is no longer using his life estate in the land, but is converting to his use the permanent growth of the land — the wood and timber — which belong to the reversioner. And although it may seem to be holding the rule strictly, to say that trees may not be exchanged for boards and stakes, to repair the fences on the premises, as was the case in *Elliott* v. *Fuller ;* or that wood may not be consumed in a house not situated on the premises, in quantity less than would be used in the house upon the premises, as was the case in *Fuller* v. *Wason ;* or that trees may not be exchanged for as great or greater quantity of fire-wood than the trees would make, as was the fact in *Paddleford* v. *Paddleford ;* yet it must be perceived that any departure from the rule requiring the wood and timber to be used on the premises, and for the advantage of the same, might lead to abuses which in the end would work great injustice to the reversioner ; and although there may be many instances in which no injury would arise to any one by a slight departure from the rule, yet we think that it will be better to adhere to the doctrine as advanced in the authorities cited.

Upon these principles, taking the bill and answers as the basis of our conclusions, and how stands this case ?

Joseph Meserve, and Betsey, his wife, have never cut or

taken from the premises either wood or timber, except through their tenant, Kingman. They had the right to lease to Kingman; for tenants for life have the power of making under-leases for any lesser term; and the same rights and privileges are incidental to those under-tenants, which belong to the original tenants for life. 4 Kent's Com. 73.

Kingman occupied the part belonging to the Meserves for two years, and during that time cut twelve sapling pines, with which to make boards to repair the bars and fences on the place. A part of the boards he used for that purpose, and the rest he left upon the premises, intending to use them, if his lease had continued; also the wood from the tops he left there. All that Kingman did was for necessary repairs on the premises, and neither he nor the Meserves are chargeable with waste, upon the bill and answers.

Tichenor Miles, who is tenant in common with the complainant in the remainder of the estate, cut one oak tree, on a disputed line. He denies all cutting after his father's decease, except this oak. The barn-frame which he is charged with cutting, both he and his mother state was cut before his father's decease. There is nothing here which upon the bill and answers would entitle the complainant to a decree.

Lydia Miles and Nancy Miles, the mother and daughter, who have resided upon the premises, have cut and sold from the land to the amount of about five dollars a year; and although it is very probable that, by their economy, they have saved that much for the remainder-men, yet they had no legal right thus to cut and convert the property to their use; and in so doing they would be guilty of waste, unless the cutting were by the consent and permission of those interested. They both, however, state that whatever they did was with the knowledge and by the express license of the complainant and Tichenor. Tichenor also states the same, and that he had frequently heard the complainant say that he had no objections whatever to Nancy's cutting and selling, for herself and mother, wood and timber to the value of twenty-five dollars a year; and that he, the com-

plainant, had given her permission to cut to that amount, and would never deny her such a privilege. He says, also, that what they have cut would not amount to five dollars a year. The answers relieve the two defendants from the charges of waste, and upon the bill and answers the bill is not sustained against any of the defendants. But the complainant has filed replications to the several answers, and testimony has been taken by him to sustain his bill. This testimony we have carefully examined, but we do not find that it alters the complexion of the case.

It is a rule in equity, that the answer of a defendant to a bill filed against him upon any matter stated in the bill and responsive to it, is evidence in his own favor; and not only so, but is conclusive in his favor, unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness, corroborated by other circumstances and facts, which give to it a greater weight than the answer. In such case the court will not make a decree, but simply dismiss the bill. *Hart* v. *Ten Eyck*, 2 Johns. Ch. 92; *Hughes* v. *Blake*, 6 Wheaton 468; *Gould* v. *Williamson*, 21 Maine 273; *Pierson* v. *Cutler*, 5 Vt. 272; *Hollister* v. *Barkley*, 11 N. H. 501; 2 Story's Eq. Juris., § 1528; 2 Danls. Ch. Prac. 983; Greeley Eq. Ev. 4.

The rule, however, does not apply to cases where the answer, admitting or denying the facts in the bill, sets up other facts in defence or avoidance. In such cases the facts so stated must be proved by independent testimony. *Hart* v. *Ten Eyck*, 2 Johns. Ch. 88, 90; 2 Story's Eq. Juris., § 1529.

It has also been held that the answer of a defendant, which is responsive to the bill, is admissible as evidence in favor of a co-defendant. *Mills* v. *Gore*, 20 Pick. 28; *Field* v. *Holland*, 6 Cranch 8.

Some of the evidence in this case has very little tendency to contradict the answers, and that which does come in conflict with them is not of that definite and satisfactory kind which leads to a conclusion favorable to the complainant. And in no respect are the answers overthrown when tried by the rules which we have stated.

The death of John Kingman, one of the defendants, was suggested at the July term, 1854, and his estate has been decreed to be administered in the insolvent course. The suit against him was thereby abated. Com. Stat., chap. 170, § 8. No bill of revivor has been brought by or against his representatives, without which the action could not proceed against him. Story's Eq. Pl., § 369 ; *Boynton* v. *Boynton*, 1 Foster 246.

The result then is, that, so far as Kingman is concerned, the bill is simply dismissed. There is no one in court representing him. But as to the other defendants, the bill must be

*Dismissed with costs.*